Good morning ladies and gentlemen, this is the time for a re-hearing on banks and United States v. Crawford and we understand that everyone is here and ready to proceed. I'd like to start by pointing out how narrow the application of the rule here advocated by the appellant and adopted by the panel that the requirement of reasonable decision for a parole search in federal court, how narrow that rule actually is. This case is not about parole supervision. As a matter of fact, the parole agent testified at the hearing and there was no question that even if something had been found by happenstance in the search of Mr. Crawford's home, it could not have been used to revoke his parole because he wasn't placed on parole until after the bank robbery, which was the subject of Agent Bowditch's investigation, had already occurred. If there's no harm, no foul, then why isn't the district court correct in finding that any taint that may have been placed on him was dissipated with regard to his subsequent confession to the FBI agent? I think we're dealing with a different issue, Your Honor. The issue of attenuation was, of course, raised before the panel in the district court and that was the basis of the district court's decision, as you pointed out. However, attenuation was never raised, even in the dissenting opinion of Judge Trott, nor was it advanced as a reason on a petition for rehearing by either the state of California or the United States government. You're not challenging the district court's finding that the taint was attenuated and therefore the confession was freely and voluntarily? Well, of course I am. I'm saying that it's not an issue. It's not seriously contested by the other side at this particular point in the proceedings. And I think that there is no question but that the district court's ruling that the sexual attenuation was wrong. As was pointed out by Judge Reinhart in the majority opinion of the panel, this particular search was conceived in order to induce the confession and its effect was, in fact, to do that. All of the factors which come into play... But we have a factual finding, don't we, counsel, that we have to find it clearly wrong? No. Because we never made that determination, did we? The panel did not make that determination in those words, but the panel analyzed the circumstances independently, as it was bound to do. The standard of review is de novo, giving, of course, due deference to the factual findings of the district court. But the factual finding goes to freely and voluntarily give an answer to the dissipation of the taint. Well, I beg to differ. I don't believe that those are factual findings. Those are legal conclusions from the facts which were found. Counsel, I have a slightly different question. The standard for which you are arguing here is reasonable suspicion. And why isn't there reasonable suspicion here where the informant told the police that Ralphie Rabbit was involved and they learned that that is a nickname of this defendant? And if that is reasonable suspicion, why do we have to decide whether some lower standard or higher standard would be required? Well, I think confusing reasonable suspicion insofar as it may pertain to the quantum of suspicion to believe that Mr. Crawford was involved in the bank robbery, as opposed to the quantum of suspicion necessary to justify the search of his residence. Those are two separate and distinct considerations as pointed out by Judge Reinhardt in the majority opinion of the panel. So you think there is not reasonable suspicion here because why? Because there was absolutely no reason to believe, as Agent Bowditch testified at the hearing, that anything related to the bank robbery, the commission of the bank robbery, would be found in the search. And he reiterated that position on a number of occasions. The record is replete with those references. The reasons which he set forth for that were the passage of time between the events in question. It happened years ago. As a matter of fact, that was one of the interrogation techniques he used. As an aside, I'm referring to the bank robbery at issue as an old bank robbery. And the materials at issue had been provided by a co-conspirator. And for that reason, in addition to the fact that Mr. Crawford was not living at the same residence at the time and had suffered an intervening prison commitment, for all those reasons, Agent Bowditch testified unequivocally he did not expect to find anything relating to the bank robbery in the search of the residence. He did, so much the better. Counsel, I'm assuming that Ms. Kallander will suggest that there was consent here. I'd like to have your view on whether or not there was consent. Could Dermot finish his question? Sure, if he'd like to. I don't mind when he responds to it, but at some point I'd like you to give us your view on the consent issue. The suggestion has been made that as a condition of parole, there was free and voluntary consent for searches. And that is another ground on which to uphold the search. And at some point, I'd like to have your views on that. Before you get to Judge Breger, can you hear me? Just a question. Yes, sir. Was there enough quantum of suspicion here so that had the FBI agent, Bowditch, waited until Crawford came out of the premises, that he could have arrested him or taken him down to the office for questioning? Yes. As a matter of fact, that was a concession which I made in the district court, which was tortured into a concession that there was probable cause for the search. It was not. What was your concession? My concession was that there was probable cause to arrest him. And that there very well may have been probable cause to arrest him, even though I was precluded from going into that area in the district court. However, probable cause to arrest is not probable cause to search. And that was the issue during the argument that Scott made that point. Before you get to Judge Scanlon's point, which is an important one I would like you to get to, but doesn't that sort of prove the government's case? There are also fine shades of meaning that you can argue with a good lawyer, and Mr. Crawford's blessed in having a very good lawyer. Thank you. And I do mean that. But the state has an interest, does it not, and when it lets people out on parole, in making sure they stay on the straight and narrow. And just as in prison they do occasional surprise bed checks and whatnot, why can't the state say, look, we'll let you go home, we'll let you have a home life, but the rule is we want to stop in on you for a good reason or no reason, and just make sure you're keeping your nose clean. And we're not going to necessarily have suspicion every time. We're going to do it, and we want you to know we're going to do it, and that way you're going to stay out of trouble by the sheer fact that you could walk in any time and search him. Why isn't that the kind of interest the state has, and that your rule would undermine? I don't believe that the rule undermines that at all, and of course I agree that the state does have such an interest. Well, it does undermine it. The state argues, and I think the United States argues, that look, we want to come in any time and do spot checks. It's sort of like saying, okay, today you're going to give us a urine sample, and we're going to watch as you give it, not because we think you may have smoked pot or whatever, but because the knowledge that we might do a surprise check will help keep you out of trouble. Why can't the state, and why doesn't the state have a legitimate interest in saying, we don't need no suspicion, we don't need probable cause, what we want to do is we want to be able to come in and look, just like we could look in your cell if we kept you there, and we do it just so you will know we might do it, and that will encourage you to stay, to keep your nose clean. Well, first of all, there is no empirical evidence to suggest that in fact, suspicionless searches as opposed to those supported by reasonable cause would have a greater deterrent value. Well, common sense tells you that. That's why you have surprise, surprise, what do you call them? Thank you. Where somebody, and any time you call in and you say, and you get a message, and the message might say, stay home, or the message might say, come in today and give us a urine sample, and you don't know what it's going to be, since you don't know what the phone call tomorrow morning is going to say, then the night before you're going to stay supposedly, I mean it's just common sense and human experience, that the risk of having somebody come in with no reason at all and find something suspicious is going to keep you out of trouble. Why is there a legitimate interest of the state? But this case has nothing to do with that. This case had nothing to do with parole supervision. The parole officer did not participate. The parole officer wasn't even present. It had nothing to do with Mr. Crawford's supervision. There was no interest in supervision implicated here. Counsel, we had the supervision issue in a case called Stokes, United States v. Stokes. In that one, the man was on parole. There was a parole search. There was no serious claim that it was related to his parole supervision. It was really authorized by the probation officer as a pretext so that he could be searched for a crime he was suspected of. And we said, we held an opinion by Judge Canby, that that was fine under a case that the Supreme Court had decided, Nights, K-N-I-G-H-T-S, because Nights emphasized the public interest in subjecting parolees to a fairly general loss of liberty and privacy in order to prevent recidivism, very much as Judge Kaczynski was asking you about. Now, I wonder why Nights and Stokes don't go most of the way to answering the question in this case. Nights left the question open as to whether or not reasonable suspicion was required. He found that it existed in that case. He did not inquire any further. And also point out to the court, to the more recent panel, Nights, K-N-I-G-H-T-S goes the other way. Another panel of this court, which is why I suppose we have en banc proceedings. And in that case, there's a fundamental difference because at least in that case, there was an interest in supervision related to the commission of the crime, which did occur or allegedly occurred during the period of supervision. That didn't happen here. Had absolutely nothing to do with it. He was on supervised release from the federal drug trafficking conviction at the time of this particular search, was he not? No, he was not, Your Honor. I thought he had a drug trafficking conviction. He had a drug trafficking conviction, but his supervised release as a result of that had expired as well. He was no longer under supervised release at the time of this search. So just by mistake? Yes, he was on parole only to the State of California. Why don't we rely on the statute, which also authorizes searches by police officers, police officers, as opposed to parole officers? Well, of course, that's what the State of California is advocating. But the theories become mixed here. On the one hand, they advance a consent theory to get back finally to your question. And on the other hand, once that consent theory was ridiculed by Judge Trott and his dissent in the panel opinion, they do a flip-flop and obligingly go down the road of special needs. Now, special needs doesn't apply. First of all, consent doesn't apply because there really isn't any free and voluntary consented issue here. There is no case from this court or the Supreme Court which supports that. The Pierce case, as is best, that's the one which I submitted to the court in the 28J letter here. Is that a question of state law? In other words, parole, as I understand it in California, is essentially mandatory. Everybody can't go unless you're deported. That's correct. Unless you choose to stay in prison, as has been resurrected, the consent theory in the 306-7 has been resurrected in the later pleadings of both the state of California and the U.S. government. If you don't sign the form, you don't get out. If you don't sign the form, you don't get out. How about answering Justice Kennedy's question now? All right. The question, if I... But consent, which is conditions upon where at issue is your liberty, if you don't consent, you are sent back to finish out your term. No, that won't wash because all plea bargains would be vitiated because you're giving up your right to a jury trial, all sorts of important rights in the Constitution standing mute. You are accepting incarceration. Most contracts are that way. It's often a tough choice between signing the contract and accepting a worse consequence, or what you think is a worse consequence. It happens in life, and it particularly happens in criminal law. What's so special about this? You want to get out of prison. You don't want to sit there and, you know, spend your days in shackles and behind bars. And the state offers you something better, not as good as being free and clear and being somebody who's never committed a crime, but a lot better than being subject to the intrusion of being a prisoner and the loss of liberty. So, you have a tough choice. You could say, gee, I would much prefer to get an expense paid to Paris, but that's not a choice open to me. Why is it not a perfectly good, legitimate, difficult, but voluntary decision that somebody makes? Well, I think this is akin to what has been condemned in Bumper v. North Carolina and Snack Lot v. Pustumante and a number of decisions of this court that consent which is obtained at the point of the sword, so to speak, is no consent at all. So, let me ask you about something related to consent, but not quite the same thing. And that's expectation of privacy. My thought is that the parolee has no reasonable expectation of privacy for several reasons. One is the form that he signed acknowledges that he doesn't, and that's how it relates to consent. He's expressed his lack of an expectation of privacy. Second, the function of parole is not to free him. It's to have him in the outside world, but subject to close supervision. He can't be free until he's finished that period of close supervision in the outside world. And third, as the man so eloquently put it, as your client put it under oath, I just, you know, just took it for granted that, you know, I'm on parole, that I don't have no rights at all. It seems like there's no reasonable expectation of privacy here. It's much as though he were to complain that somebody observed the overcoat he was wearing on Market Street. Well, the Supreme Court has never gone that far. Griffin v. Wisconsin, which is the case which is primarily relied upon by Judge Trott in support of his special needs argument, was a case which held that parolees have a diminished expectation of privacy, not no expectation of privacy. And that's what this case is all about with the question that Knight's left open. And I can't see why he would have a reasonable expectation of privacy as to searches of the place where he lives in view of all these factors that I just recited. Because the overall goal of the parole system and the diminished expectation of privacy has to do with the reintegration of the offender into the community. Exactly. And that's where the residual diminished interest comes from. The interest not only in punishment, but reintegration and rehabilitation. Exactly. So where are you going to keep your fruits of crime and your instrumentalities of crime? And if I may, the Knight's decision, if there was no expectation of privacy whatsoever, makes absolutely no sense because the Supreme Court repeatedly says we balance the rights of the parolee against those of society. If the parolee has no rights, what is there to balance it against? Counsel, a case that's recently come into this horse race is Pennsylvania Board of Probation and Parole v. Scott, which suggests that a state has an overwhelming interest in ensuring that a parolee complies with conditions of release and is returned to prison if he fails to do so. What's your response to the Pennsylvania v. Scott case? Well, I think that that particular statement is fine as far as it goes, but it does not specifically and unerringly point to what is advocated here by the state of California. That is a suspicionless search for no reason whatsoever, and I submit that arbitrary and capricious is not a standard. It is simply too subjective to be applied. We use that all the time, arbitrary and capricious. We use that right and left. Well, in determining whether or not a judge views his or her discretion, I believe that that is in fact an adequate standard Apart from the difficulty in application, Your Honor, that standard, this is exactly what the Supreme Court cautioned against in Hernandez v. Montoya. The creation of a new level of suspicion somewhere other than reasonable suspicion and probable cause, which had been endorsed by the Supreme Court, and the Supreme Court specifically in Hernandez v. Montoya, the border search kind of a situation, rejected the creation of a new level of suspicion. Do we have any finding in the district court that your client consented when he signed this form? Absolutely none. The district court, as a matter of fact, followed the old Knight's case because that was the law at the time, and so all of this is irrelevant to its analysis. So if we were to think about this case in terms of consent, in your view, would we have to send it back for a hearing on whether there was consent in traditional terms? I think that initially the district court should be given the opportunity to determine that issue, yes. Could a state do away with parole? Could California, I mean, you've attached materials that say, boy, this system is really not working. Could it just be abolished and everybody stays in prison until the end of their term and then they leave? Of course it could. Or they could adopt a federal system and tack on special supervised release at the end of your prison term. Okay, but if California could simply not have parole at all, doesn't that strengthen the state's consent argument? That is, along the lines of what Judge Kosinski was asking you, if the state is granting something that it doesn't have to, that is, the opportunity to serve the rest of your term someplace other than in prison, can't they condition it as distinct? I mean, if they did away with it, your client would just be in jail, period. And then he would be free and he wouldn't have this problem. That's another problem. But he would be subject to search only under the usual Fourth Amendment standards if he served out the completion of his sentence and then he was free. So why can't they condition it? Why isn't that a form of consent? Well, because the state of California, when it makes its choice, has to make its choice in a manner which is consistent with the federal constitution. And the federal constitution, we contend, for the reasons advanced in the brief, requires that a minimum reasonable suspicion. But you think that a consent is not even valid. I really need to understand this argument. Is it your position that even if the consent were completely voluntary, if there was evidence that you said, if I really did this because I would rather be at home subject to search than I would be in prison, that that's invalid, that you can't consent to a suspicionless search? Well, I suppose you could conceive of a system whereby that is the case, where the consequences which unerringly attach to your decision are not present. But that's not the case that we're dealing with today. Was any consent to a suspicionless search by his parole officer? Yes, under appropriate circumstances, where it's specifically tailored to the supervision of the parolee. But again, that is not the case. I'd like to follow up. Assuming for the moment that the consent is valid, I understand that's a disputed point, but assuming that it's valid, what did he consent to? I'm reading now from the form. And the initials, he's specifically required to initial two things. The first one is, you and your residence in any property under your control may be searched without a warrant by an agent of the Department of Corrections or any law enforcement officer, RC. Next, you agree to search or seizure by a parole officer, other police officers, any time of day or night, with or without a search warrant, with or without cause. Now, the with or without cause, in the initials there, the with or without cause does not mention a residence or property. The presence of property is the first clause. He says without a warrant. The with or without cause does not mention property. What did he consent to? Well, he certainly, by your reading of the form, did not consent to what is at issue here. Well, I just read the form to you when I'm asking you. He did not consent to a search of the house. It's not what he thought. If you remember what that's trying to prove, what he thought he was agreeing to, he wasn't sure he was agreeing to, he has no rights. He was not expressing as Judge, probably not as smart as Judge Fletcher. Excuse me, maybe not as smart as Judge Fletcher. Well, nearly as good a lawyer. I'm so stupid, I read the words. I understand that, Your Honor. And he clearly did not consent to a search of his residence under any view of the facts. Well, he did. He clearly consented to a search without a warrant. But not a search without cause. That's a different question. But not a search without cause. That's a different question. Exactly. And I'd like to resume. Could I just ask one question? Yes. Could you tell me, I wasn't quite clear from the record, because the law has been a moving target here. What was it that the district court held was invalid? The search as a stocking horse for a criminal investigation, which was the district court's ninth decision, which was the law at the time. The ninth one? Ninth one, yes. Exactly. And I'd like to reserve my remaining time for rebuttal. Thank you. Thank you. Thank you. Good morning. May it please the Court, Doris Calandra, Deputy Attorney General representing the State of California. Thank you for this opportunity to be heard. If the 117,000 parolees who live in our communities cannot be searched, they cannot be supervised. Any decision from this Court that holds Penal Code Section 3067 unconstitutional will paralyze meaningful supervision in the state of our parolees and also of the other 350,000 adult probationers who live in our state. And that's not because the evidence will not be admitted in a state court. The evidence will be admitted. It's because of the threat of Section 1983 liability will be preventing officers doing what they were sworn to do under the California law. What puzzles me about that argument is the allegation or contention by defendants that many, perhaps most jurisdictions, most states, have reasonable suspicion requirements. First of all, is that the case? And second, why would that be so paralyzing to California when other states apparently survive under it? The difference in California is that we have a statute enacted by our own legislature that said we know what the opposing arguments are. We understand the adamant opposition. But we are going to legislate that the law in Gurbaner is incorrect. The law in Gurbaner does not allow our law... Let me ask you to refocus. I'm not asking what the law in California is. I understand the legislature passed something. But your argument is that supervision is impossible without that statute and other states don't have that statute and do not appear to have, in their judgment at least, lost the ability to supervise parolees in any meaningful fashion. The special needs analysis in Brisbane tells us that we look to the statute provided in the state. We look to see if it's constitutional for that state. And first we have to decide if there's a special need. California's need is greater. California's people. First, we have the highest number of parolees. We have 68% assist recidivism rate in the first 18 months. 13% of those are new offenses, at least charged with new offenses. We don't know how much of the other 55,000 are new offenses. 55%. So we're looking at... Of course, the problem is relying on some other part of the correctional system. But getting back to the statute, if that statute is there, I mean, that sort of does away with the consent argument. You don't need consent of the parolee because the statute requires that condition. Do you agree with that? You don't have... That was under the old regulation of 2512, Title 1525. Does the new regulation require the consent of the parolee to impose that condition? Yes, it requires an agreement. It requires what used to be the regulation that was modified. It requires a signature. It doesn't require... Are you telling me it can't be imposed because of parolee's agreement? It can't be imposed because unless the parolee signs, he will be living inside the prison and not out in the public community. Is there a distinction to be drawn between searching for evidence of crimes that were completed before the imprisonment for which the parolee lives and ongoing or future crimes? Tonight we spoke about crimes that are occurring in the present or that might be occurring in the present. So is there or should there be a different standard when the search is related to something that was completed long ago in the past? I would have to do this whether or not there is reasonable suspicion of lease of present ongoing criminal activity or a parole violation. It could also relate to the extent of the consent. What is it the person is consenting to? To Judge Fletcher's question, are they consenting to be checked out for things that they're now doing or are they consenting to be checked for things that happened a long time ago? They're consenting to a search with or without cause that is reasonable in its manner. And that's where you turn... Are you saying the search has to be reasonable? Is that the state's position? It has to be reasonable in its manner. They cannot be for the purpose of harassment. They cannot be arbitrary and they cannot be capricious. That is manner. It has to be reasonable but no cause of the court. No cause. That comes from Reyes, the test that you just told us. I'm sorry? That comes from the Reyes case, the California Supreme Court case. No searches that are arbitrary, capricious or for the purpose of harassing or annoying. It also comes from this court in Consuelo Gonzalez when talking about you cannot have action that's oppressive. I have a couple of questions about consent. Are you asking us to hold that Crawford and people who are similarly situated to Crawford shall be deemed as a matter of law to have consented to these kinds of searches? They have consented. But they have consented to a limited waiver of their Fourth Amendment rights. What does the Reyes case say about this? The California Reyes case was prior to 3067 and at that time it was ruled based on the fact that parole in California is a right. When 3067 was enacted, it is now a conditional right, not an automatic right. That was a privilege. That was in the legislative intent. The legislative intent was saying we want this to be a privilege and not a right. I think what has occurred is that it's a conditional, you have a conditional right to release if you sign the agreement. My understanding of this record is there's no finding or holding of any kind that says that Crawford consented to any of this. Do we have to remand this to the district court in a traditional consent hearing to see if it was a voluntary relinquishment of any right that he might have had? I think that you can look at the statute and you can look at the parolee population and make a determination. The whole program under the statute, the whole program of release and make the determination. I don't know if the individual consent would really control in this case. So we don't care whether he individually consented or not. This is just as a matter of law. All these people shall be deemed to have consented to this? We know that you can waive any right. And we could have it returned for factual hearing. So you want every parolee to have a hearing? No, that's what we don't want. Section 3067B says, any inmate who does not comply with the provisions of Subdivision A shall lose work time credit earned pursuant to Article 2.5 on a day per day basis. So does this mean when you initial this piece of paper you start losing immediately credits on a day per day basis that might release you earlier from custody? The credits actually release you early. And so you've earned credits. You don't sign. Every day you don't sign, you lose a credit. You stay in prison longer. You didn't earn the credit originally put on the books. So the balance goes against you. And then when you run out of those credits under 3060.5, then it triggers to remaining for the duration of your sentence. So it sounds to me like there's a penalty that's attached to refusing to sign the document. Is that right? Except that the work time credit was a benefit to start with. But it's been earned. It's a privilege earned that would give you an earlier, it's the earliest possible release date. And so your failure to agree, you start losing something that you've already earned. Could that be seen as a penalty? The penalty of losing what you've already earned that's going to get you out of custody earlier. Right. Do you think that still is consent? I don't think you're getting out of custody early because what you're doing is you have an early possible parole date and then at that time you sign or you don't. That's just what will happen. And then you would continue to remain in until the day that you sign. Until 3060.5 is triggered. And at that time... Could we have a connection between the signing of the parole agreement conditions and the work credit, loss of work credit? Is there any... No. I mean except that it will occur. Statutorily it will occur. But it isn't something... I mean there is no other connection beyond that. Can I ask you the same question I asked Mr. McCabe and that is, assuming for a moment that the consent is valid and enforceable, where do you get out of when he wrote an initial and consented to that he consented to a search of his residence with or without cause? I clearly see that he consented to a search of his residence without a warrant. But I don't see that he consented, at least I don't see it clearly that he consented to a search of his residence without cause. He consented to a search and seizure where residence is not mentioned in that sentence. So can you help me out? Yes. The form that you're looking at is still using the 2512 form that was the old regulation before 3067 was added in. And then so the 3067 where it is all search and seizure... But this is the form he signed. Yes. So then all search and seizure would also include any possessions... But let me ask you, what he consented to, this is what he signed, correct? Yes. So on this case I'm stuck with that. Did he not consent to a search of the residence without cause? He consented to search by any law enforcement officer at any time, any search and seizure. Did he say search of what? First clause says residence. Second clause does not mention residence. He waived more as to the second clause and in the second clause no residence is mentioned. So where do you get the fact that he's waived search of residence as to with or without cause? The first would be incorporated in the second because it is a specific... You're asking a man who plays our litter at the time whether there's real consent in the sense of real understanding and not quite an issue. The question really is what do you right now and what are you holding him to? A meeting of the mind is of course a fiction in some respect. The second is the broad, the first is the narrow and it's included inside of it. Okay, I understand the argument. If you read it that way the argument that helps you if in fact there are two things there and your interpretation of them swallows, one swallows up the other that tends to suggest that your interpretation is not good. We have to read them in a way that they make independent sense. I mean you agree that if we read the first one to say you need nothing at all to search the person or the residence there's no point in having one that says you can't get a warrant because why would you need a warrant if you don't need anything at all? You would only need a warrant to go into the residence. So therefore that's what he is in fact giving up. Let me ask you about something that's been bothering me about the citations to cases here. Citations to cases involving probation and cases involving parole have been cited interchangeably. Now in practice probation is usually a lenient sentence given to somebody whose conduct and record are not bad enough to justify a prison term. Parole, you can't get parole unless you do something bad enough to go to prison first. And I'm wondering whether some distinction either has been drawn or should be drawn in the case law between what's appropriate for one and what's appropriate for the other. So in the federal system of course it's one and the same. You don't have parole in the federal system anymore. Right, except for the 4,000 folks left but it's gone, it's abolished and therefore there's a supervised release. In California we do have two systems and you are correct. The probationer is theoretically the less culpable. He doesn't go to state prison. He gets a lenient sentence that may involve up to a year in local time. The Fourth Amendment concern on whether you have a legitimate expectation of privacy, whether your privacy is significantly reduced is not different on that point of what the individual's expectation of privacy is. Where it comes into play is in the special needs balancing of what the governmental interest is, the overwhelming governmental interest of Scott. I thought the legislative history of the statutory changes in California suggested that the legislature at least was trying to make parole more like probation. Did I misread that? What it was looking at was the Bravo case existed that said you don't need reasonable suspicion for search of a probationer, the less culpable person. You do need to have reasonable suspicion under Bourbon Earth, that's wrong. We can't have that kind of system when it is the more culpable. They weren't trying to make it in terms of the supervision or the structure or who is responsible. They were only trying to draw some parity between a search of the probationer, the less culpable, and the search of the parolee, the more culpable and more dangerous. Counsel, here we have an FBI agent doing the search apparently with the consent of the parole officer who was not part of the search. What's the significance of that in this case? In under 3057, you consent to a search by any law enforcement officer. Well, what about the significance of that under the Griffin versus Wisconsin line of cases? We're just looking at probation and parole as special needs. So if you try to justify it under the special needs doctrine, then it doesn't meet the special needs. It has nothing to do with parole because it's an indefinite crime in which the FBI agent on a mission occurred before he was even placed on parole. Under special needs, we have to have the first, the finding of a special need beyond normal law enforcement. The purpose of this statute is public safety. Public safety is the special need of the government. Two purposes for one is to present recidivism and two is to foster rehabilitation, right? Yes, our primary purpose in public safety. And this does neither. It's to investigate a crime that occurred before parole was even instituted. But for Griffin, you have to look at the statute. You have to look at the program. You're determining whether or not the program is lawful, then you're determining whether or not the search was done in a lawful manner according to that program. So you first have to have what you're speaking to. Was it beyond that which was provided in the program? That is different than the fact that the statute itself is lawful under the Constitution. The statute is also lawful under the United States Benightened under the traditional balancing test. We don't need to go to special needs for the statute itself to survive. Again, what is the governmental interest? We don't know the full scope of the statute. Are you saying that the job went stream forward before there might have been a requirement for parole? Yes, it could. You don't know. In fact, the most recent case doesn't apply to a police officer who doesn't know that the person is on parole, right? So if you follow that thought, I think quite probably it wouldn't apply to the crimes that occurred before parole was instituted, would it? But we're looking at the program, not the search of one person. We're looking at the program, the legislative program. And again, as just as Elissie was saying, deterrence exists. The deterrence is there. The program provides deterrence. We know from Griffin that you have to have intense supervision. How is it a deterrent to investigate a parolee for a crime he committed before he was even placed on parole? Well, the investigation is different from the search or seizure. The purpose of the search was to foster the FBI's interest. And then the question was reasonable manner. That defaults to reasonable manner, which would be true under the 9000 statute. I understand that, but it wasn't to foster the parole agent's interest. It was to foster the FBI agent's interest in looking at an old crime. And that's the individual search versus the statute and the program. California's interest. But you're not interested at all in looking at this individual search. I mean, that's what we have to decide, the individual search. And I would defer to the U.S. attorney because he does have a compelling argument on that, but our position is that the statute is what California has on its books that must be enforced and the integrity of the statute must remain, not the one search of this individual. Could you clear up a misunderstanding I had of the record? When he committed the bank robbery, he was on supervised release on the federal drug trafficking charges. I'm going to defer to the U.S. attorney if I may. I read that in the pre-sentence report. I'm going to give you the answer. If I may defer, I would like to because I'm trying to stay away from that. I would like to know the answer because I'm looking at a guy with a history of committing crimes in between his various prisons. We know that there's no irreducible level of suspicion required. That has to be applied to a whole California statute. We know that deterrence works. On the issue of consent, there are other state Supreme Courts that have looked at this. Ohio, Idaho, they've said it is consent and it is waiver, as has Virginia. One point made earlier is that often there are unattractive choices presented to a defendant, particularly at something like a guilty plea stage. The fact that you choose between two unattractive, ultimate choices doesn't make the choice less real. The other point that I really would like to emphasize is that California's Reyes case, as opposed to the second Reyes case, the California Reyes case has no bearing on 3067 itself. They did not have conditional parole before it. The conditional parole did not occur until the passage of 3067 and it applied to those who committed their offenses on or after the 1st of January of 1997. So Reyes is of limited help to the court in deciding on the consent issue. Counsel, one of the things that I find striking in this case and that I continually find surprising in California cases is just how soon people with really serious crimes and very bad records get out of prison. I don't know what they're doing on the street. In Alaska, they get locked up for a much longer time. What I'm wondering is whether the fairly restrictive parole conditions are part of a package of fairly lenient imprisonment sentences in California. Whether the California scheme is to let them out earlier than Alaska or perhaps many other states but subject them to much more rigorous regimes of supervision after they get out. That's why cases like Morrissey are useful but of limited use when you're trying to decide what is a state statute, what is a state parole system. Our parole system is linked to our determinate sentencing. Determinate sentencing says that you will remain in prison according to what crime you committed. Then your parole term is linked to the crime you committed. That is all part of the statute. Determinate sentencing does allow very lenient  then the person is out. They are out at the stroke of midnight not because they have shown any group that they are worthy of rehabilitation or probation or proof. They just get out because their time is up. Thank you very much. Thank you very much. Thank you very much. Thank you very much. Thank you. We will concur in all remarks made concerning the viability of the search in this case. At its most basic level, however, the United States comes before the court to resolve the question whether or not evidence which is seized during or is obtained as a result of one of these parole searches could be admitted in federal court. That's our basic interest in being here. And this case, even if the evidence was illegally obtained, presumably if there's sufficient attenuation, you still prevail. That would be correct, yes, under the way the case was presented both in the district court and on appeal, we did argue attenuation. The questions from the court this morning have been focused on the search itself. I'd be interested in your view on that as well. On the search. As I was saying, we are the simple answer to the question we just posed is that the answer is no, this evidence can't come in if it's seized in a parole search, a suspicionless search. And that merely reaffirms the Garcia Cruz holding which previously made that statement without really giving a reason for it except to say we're going to follow California law in that respect which goes back to talking about inciting on that issue. That is, if you look at what the California law is on the topic as to whether or not the search is legal. And in this particular case in California, the majority in this case held that by using the independent review under the constitution, this court could nevertheless find that the search was illegal, a suspicionless search was illegal. So it's up to, and in doing that, the majority here basically decided that its interpretation of certain Supreme Court cases was superior to that of the California Supreme Court. And so it's up to this in-bank panel to decide whether or not the majority was correct in its interpretation of those Supreme Court cases or whether those cases can be properly construed in the way that we have in our brief. Can I ask you the following? If you assume, I understand this is a disputed question and you disagree, but if you assume that this search was unconstitutional, do you argue that there has been too much attenuation or an insufficient connection between the search and the confession, and if so, why is that so? Well, as I say, we certainly did that in the district  and the FBI office that you really don't have to come down here and talk with us. You're not under arrest. So these guys come in with their guns drawn and say you don't have to come with us. If you'll recall... That's the argument. I understand it, but is there more to it than that? I think we're overstating the fact that the search was primarily done by state officers, and there was a San Diego police department robbery detective who was there and did participate in the search, and he came in to the bedroom with his gun out. Why did he come in with his gun out? Because this individual has a history of violent behavior and abuse of guns. So this is more of a prophylactic thing than anything else. The gun was holstered. They sat down for 30 minutes to talk to this individual. They told him you don't have to go down with us if you don't want to. Would you feel more comfortable talking here instead of in this family circus that's going on with his sister and her children and everybody standing around? Crawford said yes. Let's go downtown. So they went downtown. He was told he was not under arrest. He wasn't given his rights. So with that stretching that time period out, even though it was a matter of hours rather than days, there was a certain amount of attenuation that went on. Well, going back, I think that going through the written cases both in this court and from the Supreme Court, that we all have to agree that there are dual purposes of parole, that is rehabilitation and the protection of the public. And that parole does not enjoy the absolute liberty that everybody else does in society, and that the searches under the law of versus Harris tells us that these kinds of searches, parole searches, have to be governed by unique and separate sets of rules. And Griffin tells us that supervision is a special kind of need that is needed for the supervision of the individuals. So your position is that we could decide this on the basis of the Supreme Court's ruling. We believe that there are basically three different theories that can be used to uphold this search. And that triumvirate, if you will, the trifecta, is given to us by Knights. Knights tells us you can have consent, you can have special needs, and you can have the balancing, that any one of those theories, I would suggest, fits our contention that the search here was perfect. Why don't you rank those three in terms of the most persuasive at this stage, from your point of view? I believe that Griffin would tell us that the special needs rationale is probably at the top of the list. And because that is talking about the suspicionless search, Knights is not a suspicionless situation, nor is ZAP. The Supreme Court ZAP case. Does the special need have to be something other than law enforcement? Just by definition, doesn't it have to be something other than law enforcement? Oh, absolutely. What was the purpose here other than law enforcement? There was a desire to search for evidence of an old robbery. That sounds like a classic law enforcement purpose. That's correct. But that doesn't invalidate the search. If you read Edmund closely, he tells us that you look at the program, what is the purpose of the program is law enforcement such as a stop. The special needs doctrine does not fit. Are there any other special needs cases that are this closely tied to law enforcement programmatically? In other words, there may be things about medical necessities or various other things that are completely unrelated to law enforcement. I would suggest the analogy to what we're talking about here are border searches down at the border. That's a situation where there is a the United States has a special need to search individuals when they come across the border. And that special need is to, for instance, collect tariffs. It is to prohibit the entrance of  fruit or parrots. It's to make sure that illegal persons do not enter in violation of immigration laws. And it also happens to have a law enforcement component to it as well. That is, that law enforcement arrests and prosecutions for bringing, for example, parrots with nuke acid disease. In addition to having the parrots seized under various agricultural laws. So you have the dual purpose that goes on.  searches are conducted for a special need of the United States government. And the person entering the United States has an extremely low expectation of privacy. The consent doctrine works here because this is an advanced consent to a search. It's a matter of law. So it's irrelevant that there was no hearing in the district court or exploration of this issue. I would suggest that's true. I would suggest that if the person signs the form, that that is a matter of law, is a consent to be free of that's a consensus, a suspicionless search, except one which is unreasonable. What if he denies signing the form? I'm sorry? If he denies signing the form, you agree that he'd get a hearing then? If he denies, if he says, I don't want to sign the form, he goes back into custody. Okay. What if he says, you know, I really was very happy in prison and I had a good relationship with my celly and I liked the scenery, but they said they would break my legs if I wouldn't sign. That's what they told me. So I signed. Does he get a hearing then? Well, that certainly wouldn't be consent. Yes or no? Does he get a hearing then? Is that a tough question? I suppose he would. Okay. On what? On whether it was consent or whether there was a gross indictment. And what would that hearing concern? Whether they applied some threat to him. Yes. I mean, obviously he signed. He must have felt it was better than an alternative. Now, how is that different from the situation here where he says not only once you get out, but you lose the good time credits? I realize it's a little different from having your legs broken, but presumably this is a lot of time that he's earned on the outside. I don't know what it is in Mr. Crawford's case, but it can be in the case of some prisoners, years of life. And I'm sure that prisoners would rather have their legs broken than lose that time. It's certainly conceivable. So I'm wondering if they say not only will we not let you out, but you're going to lose these credits that you've already earned, because basically time on the outside will take those away from you. Why isn't that the kind of thing that you'd also get? You've already agreed that you get a hearing if they suddenly break your legs. Why don't you get a hearing here when he says, look, I only did it because they were going to take away my war credits? Well, I don't think you need a hearing because that's a given. You know that that's going to happen. If you don't sign, that's what's going to happen. But you agree that if the government could say, yes, we did agree that we'd break his legs if he didn't sign, then he'd get a hearing.    hearing, you don't have the consent. The consent would be imbalanced. How is this different? How is saying you lose time on the outside, freedom you've earned, free and clear, how is that different from saying we'll break your legs? Because the losing of time is a given. That's something that just happens. You'll need to have a hearing to establish that. You don't get a hearing. It's established. The government concedes it. So you don't need a hearing. So now we have a situation where the government concedes, we did threaten to break his legs and you agreed, you said, in that case the consent would be initiated, right? Now we say the government says you will lose time on the outside, precious life as a free man. You don't need a hearing. How is that different? How is losing that time different from saying we're going to break your legs? Why doesn't that initiate the consent? I would have to argue against it. Explain to me why I should agree with you. That is a threat      you that the government doesn't agree with you. I can tell you that the government doesn't agree with you. I can tell you that the legislature tells us parole is a privilege and not a right. What he's basically doing is pointing out that he's making a choice   He makes a choice when he says I don't want my legs broken too. Choice alone isn't enough. You've already gone too far down the line.   too far down the line. This is a loss of your life on the outside. Actual time when you can be a free person with your family being just like everybody else. How does the threat you will lose this thing you've earned not initiate the consent? Give me a chance to sign on. The theory is as I believe you brought up with Mr. McCain, the theory is that much like a plea bargain that you were giving something up and that does not initiate the plea bargain. And that is the theory. So you're citing me. You're citing me. Good answer. Not entirely persuasive. You may complete your answer to the question. I believe it is very similar to the plea bargain, which is the theory again the California Supreme Court uses in the Bravo case. But the way I read the record though, he wasn't really given a choice. He was told you'll sign this. Isn't that the way the record reads? He was told you'll sign this. The record does not really go into the consent because it was just simply not an issue down below. The issue was the theory of whether or not this could be a law enforcement search warrant. The parole agent came and said he signed it in prison and I gave it to him and we talked about it and we initialed it. But I think again the most telling evidence is of what Faulkner himself said that I know I don't have any rights. Thank you, Ken. Good time. Just to follow up on the last point, the statement made by Mr. Crawford as Judge Reinhardt observed the panel was not directed at his reasonable expectation of privacy. It was an acceptance of the way things were, the way in which the California state parole system operates and his knowledge of that. That is not the equivalent of an expression of a lack of a reasonable expectation of privacy. Why not? Because it is simply an acceptance of what is going to be imposed upon him anyway. I know perfectly well if I walk down Market Street a perfect stranger can observe the color of my suit. That is the way things are. It isn't a matter of whether I like it that way. It is just the facts of life. Why is it any different? But the statement is not a reflection of what he believes in his life. If I go out to the airport I know I will have to go through a metal detector if I want to get on the airplane. We have clearly said my expectation of privacy is not one that society is prepared to accept as reasonable. Why doesn't that apply? There are two components to reasonable expectation of privacy. The subjective component is being utilized by the government to defeat the subjective aspect of this. My argument is this is not an acquiescence. This is the objective expectation of privacy which is the first component. The second component is the objectively reasonable in terms of society's willingness to accept it. That is the objective inquiry which is separate from the subjective expectation. I think you are confusing the two. Subjective means what his state of mind is. His state of mind was I don't have any rights against this stuff. That is subjective. The other question is subjective. That is whether society is ready to accept that. I was seeking to distinguish between the two points of view as to the reasonableness  search. I hope I made myself clear. That is awfully strong. I go to the airport and I know I will lose my pen knife if I forgot to take it out of my pocket. If I have anything I prefer to be private in there, it won't be. I didn't commit a felony. Again, that goes to the objective component of the reasonableness of the search. As a society, because of the special needs, Judge Trott went into a great deal of Balderall. His own personal experience with the transportation safety administration. All of that goes to the objective reasonableness of the search. The objective expectation of privacy of the individual against whom the forces of society are. The objective is overridden by what society is willing to accept. Even if he thought I have the right of privacy, society says no you don't because you are parolee. The California legislature expressed formally the will of the people. The objective aspect is what the court called upon to determine in this particular case. If you have no expectation of privacy if you don't, why does it matter that objectively you maybe should? Well, the court has said that you have to fulfill both prongs of the test. Anyway, it's a very bad test because you can put up a sign that you give up all your rights if you enter this room and you do it. Isn't there a sign that says over hell lose all hope? Well, I have a message for you. I'll let you know. I'll let you know if there is one. I'd like you to get to Ms. Galanda's argument. Her argument is not that there is no hope. There are a number of signs that indicate that you are subject to search and giving up a lot outside the parking lot. Why can't they have a sign that goes on the parking lot? The question is what is the legal efficacy of the sign? And the signs aren't necessarily determinative as you yourself have written. On the question of special needs and the program, I'd point out and agree with the points which were made in your question. The question is that the program is not the end      look at the way in which the program is being used. And the question is that the program is not the end look at the way in which the program is employed as to whether or not it is being faithful to the means or the justification of the theoretical underpinnings of the doctrine in the first place. The fundamental problem here is that this is not a parole search. The fundamental problem here is that the state of California is asking this court to torture a new rule of criminal jurisprudence based upon the perceived need to do that and the need does not exist. It is not a parole search because it wasn't conducted by a parole agent. It had nothing to do with parole supervision. He had the consent of the parole agent. He didn't have the consent of the parole agent. The parole agent testified his consent wasn't there. It seems to me that the argument you just made is the argument that succeeded in our court in nights and then the Supreme Court reversed this and said we should not accept that argument in nights. What the state of California and the government is trying to do now is to infuse purpose back into the analysis. And that was the point that was rejected by the Supreme Court in nights. The purpose does not matter. In nights it didn't matter that it wasn't a parole search. In nights what was critical was we thought it had to be a real parole search and the Supreme Court said no it wasn't  parole search. The special needs argument is all about purpose which is contrary to nights in the first place and secondly there is no special needs here and the proof is in the pudding that being the report of the little thing.  problem with the system is not that we do not have the ability to search parole needs without any cost. The problem with the system is far more reaching than that. That is because California has chosen to administer the parole system in a way that they subject them to a lot of supervision. They don't do that either. They don't supervise them much at all. All they do is hit in this kind of research according to the documents and the data compiled by the little Hoover Commission. They don't prepare the people to leave and move back into society where they have nothing to go back to except the old environment. They are just lost. They have turned out the streets and I see hundreds of these people in homeless shelters and when they are there and they are cared for and they have some future, they just behave themselves perfectly. So it's the system that in many instances in my district that's creating these problems and that's why we hear these floodgate arguments. And that is precisely the finding of the little Hoover Commission which I have just submitted to you. And I believe that my time is just about out. Thank you.
judges: Schroeder, Pregerson, Kozinski, O'scannlain, Trott, Kleinfeld, Tashima, Graber, W.fletcher, Tallman, Clifton